UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALBERT BURROWS,

       Plaintiff,

v.                              Case No: 2:25-cv-11-JES-NPM

BILL PRUMMELL, as the duly
elected Sheriff of Charlotte
County, Florida,

       Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on a Dispositive Motion for Summary Judgment (Doc. #20) filed by Defendant Bill Prummell on November 7, 2025. Plaintiff Albert Burrows filed a Response (Doc. #27) on November 28, 2025, and defendant filed a Reply to Plaintiff's Response (Doc. #30) on December 17, 2025. For the reasons set forth below, the motion for summary judgment is denied.

## I.

Summary judgment is appropriate only when a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party. McCreight v. AuburnBank, 117 F.4th 1322, 1329 (11th Cir. 2024) (citation omitted). A fact is "material" if

it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, a court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). Even if facts are undisputed, a court should deny summary judgment if reasonable minds might differ on inferences arising from those facts. St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ. Of Bibb County, 495 F.3d 1306, 1315 (11th Cir. 2007).

Sheriff Prummell argues that "inadmissible hearsay may not be considered in deciding a motion for summary judgment and cannot serve as a basis to create a genuine issue of material fact." (Doc. #20, p. 10.) This is not the complete rule. In considering a motion for summary judgment, a district court generally cannot

consider inadmissible hearsay. <u>Jones v. UPS Ground Freight</u>, 683
F.3d 1283, 1293 (11th Cir. 2012). But a district court may consider
a hearsay statement at the summary judgment stage "if the statement
could be reduced to admissible evidence at trial or reduced to
admissible form." <u>Id.</u> at 1293-94 (quotation marks omitted). A
typical method for having hearsay testimony reduced to admissible
form is to have the declarant of the statement testify to the
matter at trial. <u>Id.</u> at 1294. In any event, the Sheriff does not
identify any evidence relied upon by plaintiff to which he objects
as being inadmissible hearsay.

**II.**

Unless otherwise noted, the following facts are derived from
the Sheriff's Statement of Undisputed Facts (Doc. #20, pp. 2-10)
and plaintiff's responses (Doc. #27, pp. 2-7.)

Defendant Bill Prummell (defendant or the Sheriff) has been
the Sheriff and chief law enforcement officer of Charlotte County,
Florida since January 2013. As such he is in charge of the
Charlotte County Sheriff's Office (CCSO).

Plaintiff Albert Burrows (plaintiff or Burrows) is a former
employee of the CCSO who was initially hired in January 2011 as a
correctional officer. In September 2019, Burrows applied for and
was hired in a civilian position as Support Services Assistant
Supervisor for the CCSO. Support Services involves the
"coordination, planning and supervision of the facility lawn

- 3 -

maintenance program and provides regular preventative maintenance
to systems and the physical structure of the Facility." (Doc.
#21-1, Ex. 5.) Burrows later became the Support Services
Supervisor, whose job is to "facilitate the flow of the programs
department, including the Hydroponics Program, Fish Program, a
variety of inmate Programs and [to] oversee the Mail Department,
Laundry, and Hurricane Supply Room." (Doc. #21-2, Ex. 7.) In
both of these civilian positions Burrows was considered an
"essential" employee under the CCSO's emergency response plan. As
an essential employee, Burrows was expected to remain on shift
during emergency events such as hurricanes.

CCSO employees were expected to notify Risk Management when
the need for Family Medical Leave Act (FMLA) leave arises. The
CCSO maintains an "FMLA Guideline and Procedures" document and a
Department of Labor's Employee Rights and Responsibilities notice
to advise employees about their rights when requesting FMLA leave.
(Doc. #21-3.) The CCSO provides employees with a template FMLA
Employee Leave Request Form and a Certification of Healthcare
Provider form (Doc. #21-3) when the employee notifies Risk
Management of the need for FMLA leave. Burrows was familiar with
the Guidelines and process, and understood they applied to him.

Prior to Hurricane Irma in September 2017, Burrows forwarded
an Inter-Office Memorandum through the CCSO chain of command
requesting that as a "special consideration" he be granted leave

to stay home with his wife during the hurricane. (Doc. #21-19.) Burrows described his wife as "basically disabled and I am the sole caregiver." (Id.) Burrows also described several of his wife's limitations and several of her chronic medical issues. (Id.) This request for special consideration made no reference to the FLMA and was approved by a CCSO Major with Burrows being advised he was "non-essential." (Id.) Burrows did not seek FMLA leave associated with the request for special consideration. (Doc. #21, p. 81.)

Thereafter, Burrows developed a significant history of requesting, and being approved for, FMLA leave from the CCSO to aid his wife. Beginning on June 22, 2018, Burrows requested intermittent FMLA leave based on the serious health conditions of his wife. (Doc. #21-4.) Burrows completed the CCSO FMLA Employee Leave Request Form, stating that the care he would provide his wife included daily assistance getting up and down, help in and out of his truck, transportation to and from doctors and stores, and providing help when her muscles were cramping. (Id. at 3.) A physician completed the medical portion of the form, including a statement that Burrows' wife suffered with significant disabling chronic back and joint pain, and needed assistance from her husband on a daily basis with activities of daily living and doctor visits. (Id. at 4-5.) The physician also estimated intermittent patient care would be needed for the next year. (Id. at 5.) The Risk

Management Specialist acknowledged receiving information on July 13, 2018, and approved FMLA leave. (Id. at 7.) On January 11, 2019, the CCSO sent Burrows a letter noting that he was currently on Intermittent Family Medical Leave, stating that recertification was required, and providing a form to be completed by a health care provider. (Doc. #21-5.)

On January 17, 2019, Burrows completed the CCSO FMLA Employee Leave Request Form, and signed the Certification of health Care Provider on January 24, 2019, stating that the care he would provide his wife included daily assistance standing and walking as needed; that she would soon have surgery on her shoulder; that she was receiving neck injunctions; that she needed transportation to and from doctor's appointments. (Doc. #21-6 at 1, 3.) The same physician completed the medical portion of the form, including a statement that Burrows' wife needed frequent doctor visits and help with daily activities. (Id. at 4.) The physician also estimated intermittent patient care would be needed for the next year since the issues were chronic. (Id. at 5.) The intermittent FMLA leave was again approved by the CCSO. (Id. at 7.)

This pattern repeated itself approximately every 6 months thereafter through 2021. The CCSO requested Burrows to update medical documentation in order to recertify his continued need for intermittent FMLA leave. Burrows recertified his need for intermittent FMLA leave in January 2019, August 2019, February

2020, July 2020, February 2021, August 2021, and November 2021. (Docs. ## 21-7 to 21-14.)

By February 2022, Burrows no longer needed intermittent FMLA leave because he had more flexibility at work as the Supervisor and was able to schedule his wife's doctor's appointments around his work schedule. Burrows failed to provide the recertification requested by the CCSO and was taken out of Intermittent FMLA. In doing so, the CCSO advised Burrows he could apply again with the proper paperwork. (Docs. #21-15, #21-16, #21-17.) Burrows did not seek recertification of intermittent FMLA leave in 2022.

In all, Burrows requested FMLA leave on at least ten occasions[1] while employed by the CCSO under Sheriff Prummell. On each occasion FMLA leave was approved and Burrows was reinstated to his position without incident.

Prior to Hurricane Ian in September 2022, Burrows wrote an Inter-Office Memorandum (Doc. #21-20) to a CCSO Corrections Captain asking "for consideration to be exempt from having to stay at the CCSO jail facility during this hurricane." (Id.; Doc. #21, p. 82.) The request for leave was approved, but Burrows was informed that "if he was unable to be in attendance for another incident that would require him to be stationed at the jail for any length of time, [CCSO] would need to consider making some

---

[1] Two of the FMLA leave requests were because of Burrows' own personal medical conditions at the time.

changes with his job classification." (Doc. #21-21.) Burrows responded that he would need to speak with his wife, and he was advised to do so and to complete a memo with his decision. (Id.)

After conferring with his wife, Burrows wrote a memorandum to Captain Carter stating: "This memo is to inform all of my intention to continue my current position as an Essential employee as a Support Services Supervisor." (Doc. #21-20.) In a revised version of the Memo, Burrows added the following line of text: "In the event of a hurricane, I will be able and available to stay in the jail facility. Fully conducting my duties as a CCSO supervisor." (Doc. #21-22.) Burrows asserts that he added the sentence to the revised memo under duress and was told by CCSO personnel what to add to the original Memo.

The next two hurricanes to impact the area were Hurricane Helene and Hurricane Milton in 2024. Burrows was on preapproved vacation leave during Hurricane Helene.

Before Hurricane Milton impacted the area, Burrows again requested special consideration to remain home with his wife until the storm passed the area. On October 6, 2024, Burrows sent an email to CCSO personnel with the subject line of "Problem with the storm":

> My wife is already crying on the phone when I told her I will have to stay. She has high anxiety, fighting depression and has chronic pain. We also have a cat that is considered her companion pet for her depression and anxiety, and she will not leave her. She has also had

past neck, back and knee surgeries. I will come in Monday
and Tuesday but will need to leave Tues. after work. I
understand that I am considered essential and am
supposed to stay. Capt. Barber and Capt. Carter had said
in the past that I could be forced to take a different
position. If that is the case, then that is what I will
have to do. My wife is the most important person in my
life.

(Doc. #21-23.)  The next morning Burrows followed up with another

email:

First off, this morning, I would like to apologize
for my email yesterday. I realize that it came across
and sounded demanding. That is not my intention. I am
genuinely concerned for my wife's safety. And I am
stressing and scared that I could lose my position
because of what I am asking. I am asking for special
provisions to be able to be with her on Wednesday/during
the storm. I am doing everything possible to protect the
hydroponic system. I am asking to be able to leave on
Tuesday after shift and return Thursday morning.

(Doc. #21-24.)  On October 8, 2024, Burrows sent an email directly

to Sheriff Prummell regarding a "serious issue":

Good Morning and sorry to bother you.
I have been an employee since Jan. of 2011. Started
as a Housing Deputy then as Intake Deputy and now as
Support Services Supervisor.
I have what I believe is a serious issue. I am the
Support Services Supervisor (Civilian and considered
essential). But I have a problem: my wife is on the verge
of disablement.
A little about her: She has depression, anxiety,
chronic pain, she has had neck surgery, back surgery
with multiple occasions of back injections and knee
surgery with the same injections. We do not have any
family in Florida. Reasons she will not leave the house:
she has a companion cat that she must keep with her for
a calming effect, she does not drive and does not have
a driver's license, she can't go to a shelter with her
cat, she would not be able to get down and up off the
floor. No family to go to. And I am not available. She
is on chronic medication for the past 8 years. Difficulty

- 9 -

in lifting and filling the generator as a five-gallon
gas can is 40 lbs. and hoping that she remembers to shut
it off and cool down before refilling.

In the past: during hurricane Irma I was a housing
officer. I wrote a memo requesting the storm off (due to
my wife's issues) to Capt. Wilson and it was approved.

During hurricane Ian, I assumed I would have to do
the same. I wrote a memo to our current Capt. Carter and
Capt. Barber (Wilson had moved on) requesting only the
storm time off. With some apprehension from them it was
approved.

During Helene I was on Vacation anyway.

Now for Milton I had requested the time off again
and was denied and had to report as essential. I was
told to report, or the case would be taken to HR and
probably would not have a job any longer. I had requested
to be able to leave work on Tues. at end of shift, now
maybe Wednesday at end of shift (hurricane now slated to
make land fall Thursday morning 2am) and return as soon
as the storm has passed, even in higher wind and rain.
Long enough to make sure that my wife is safe.

I am here now because my wife insisted that I go to
work.

As Support Services Supervisor all programs'
employees are not here, classes are cancelled until at
least Friday.

My hydro and fish area are shut down and the
facility outside area has been secured.

I am asking if you could consider interceding on my
behalf and allow me to be home with my wife, only until
the storm passes our area.

If you read this, I apologize for taking any time
you need from the current weather situation.

If you cannot consider this, then please completely
disregard this email. I don't want to bring any undue
repercussions on myself.

(Doc. #21-25 at 2.)

Sheriff Prummell responded within a few hours:

I am sorry for your situation. There are pet
friendly shelters she can go to. Unfortunately, it is in
your job description that you are essential, and you
knew this going into it. If you are unable to meet all
the requirements for the job, you might want to see what
positions we have open that are not considered

essential. I am sorry to sound harsh, but this is what
we signed up for. If I make acceptations for you, I must
do it for everyone who claims a hardship. This is why we
give notice, so everyone has time to prepare.

(Id. at 1.)  Burrows thanked the Sheriff for taking the time to
look at the email.  (Id.)

On October 9, 2024, Burrows reported for duty at the CCSO
prepared to work his full shift.  During his shift, Burrows' wife
called about the threat of a tornado and thought she was having a
heart attack. (Doc. #21, p. 94.)  The parties dispute the tone and
contents of Mrs. Burrows telephone conversation with her husband.
In any event, Burrows decided to leave work to go home to his wife,
so he went to talk to his manager but spoke to Director Rodgers
and informed his manager he was leaving.  (Id. at 95-98.)  Burrows
never contacted Risk Management regarding his need to leave.  (Doc.
#26 at ¶ 12.)

On October 11, 2024, Burrows was notified of the Sheriff's
intent to withdraw his appointment for abandoning his job during
an emergency event.  Burrows refused to sign the letter.  (Doc.
#21-26.)

On October 15, 2024, Burrows participated in a pre-
disciplinary hearing at the CCSO and was afforded an opportunity
to provide mitigating circumstances or facts prior to imposition
of discipline.  Burrows made a statement and took responsibility

for his actions.  (Doc. #27-8.)

> Okay. So I am sitting here because of my actions on
> Wednesday the 9th, and I take full responsibility for my
> choices. I know Hurricane Milton was announced to make
> landfall near Venice, essential employees were activated
> and were to stay until the storm passed and released by
> admin -- administration. I had all intentions of
> staying. I had all my necessities prepared, and they
> were already at the jail. I was at the jail working when
> Milton was set to make landfall around 8 p.m. -- around
> 8 p.m.· Everything was going okay….

(Id. at 3.)  Director Rogers told him not to leave the CCSO because

it was too dangerous due to weather bands, but Burrows made the

decision to go.  (Id. at 4.)  Before leaving, Burrows asked his

manager to come out.  Burrows was stressed and emotional and said

he needed to leave.  He returned his keys in the key box and left

the CCSO.  Burrows stated:

> I take full responsibility for my actions. I made this
> choice. [Mrs. Burrows] originally did have plans to stay
> with the neighbor, but the tornado was arriving eight
> hours before Milton was to make landfall. I had every
> intention of staying at the jail. All my clothes,
> sleeping gear, and food was there. ·I don't feel like I
> abandoned my post. I had workers ready to go back to
> housing.

(Id. at 5.)

Burrows admitted he knew there would be consequences for his

actions, but he hoped that it did not equate to termination.  (Id.

at 5-6.)  Burrows acknowledged that "essential" was not going to

work for him.  (Id. at 8.) Burrows never referenced the FMLA during

the hearing.

Sheriff Prummell stated that he took no issue with Burrows'

work product and that he had done a good job, "but when the community needs [Burrows] the most, [he] leaves." (Id. at 9.)

On October 16, 2024, Burrows received the letter officially withdrawing his employment. Burrows signed the letter. (Doc. #21-27.)

### III.

On January 5, 2025, Burrows filed a two-count Complaint (Doc. #1) asserting violations of the FMLA by Sheriff Prummell "as the duly elected Sheriff of Charlotte County, Florida." (Doc. #1, Caption.)[2] Count I alleges a claim for interference with Burrows' FLMA rights by failing to provide certain required notices, denying FMLA leave when such leave was required to be given, and not restoring him to his employment position. Count II alleges a claim of retaliation for terminating Burrows' employment because he requested FMLA leave. The Sheriff now seeks summary judgment on both counts.

#### A. FMLA Overview

The FMLA entitles "eligible employees" to take up to 12 weeks of unpaid leave "for any of several reasons." Nevada Dep't of Hum. Res. v. Hibbs, 538 U.S. 721, 724 (2003). As relevant to this case, "an eligible employee may take 12 weeks of so-called 'family-care'

---

[2] The Court reads this as being an official capacity suit against the Sheriff, since there is no FLMA claim against an employer in his individual capacity. Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999).

leave 'in order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.'" Williams v. Bd. of Trustees of Univ. of Alabama, 128 F.4th 1208, 1212 (11th Cir. 2025) (quoting 29 U.S.C. § 2612(a)(1)(C)). An "eligible employee" who takes leave "for the intended purpose of the leave" is entitled upon "return from such leave--(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). "In order to receive FMLA protections, one must be both eligible, meaning having worked the requisite hours, and entitled to leave, meaning an employee has experienced a triggering event." Pereda v. Brookdale Senior Living Communities, Inc., 666 F.3d 1269, 1272 (11th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1))).

"The FMLA prohibits employers from interfering with, restraining, retaliating against, or denying 'the exercise of or the attempt to exercise' any rights guaranteed under the Act." Matamoros v. Broward Sheriff's Off., 2 F.4th 1329, 1337 (11th Cir. 2021) (quoting 29 U.S.C. § 2615(a)). The FMLA thus creates two types of claims — interference claims and retaliation claims. 29 U.S.C. § 2615. In an interference claim, an employee asserts that the employer denied or otherwise interfered with substantive

rights under the FMLA.  29 U.S.C. § 2615(a)(1).  An employee claiming interference must demonstrate by a preponderance of the evidence that the employee was eligible for the FMLA benefits and that the employee was qualified for FMLA leave.  Hurley v. Kent of Naples, Inc., 746 F.3d 1161, 1167 (11th Cir. 2014).  In a retaliation claim, an employee asserts that the employer discriminated against the employee because the employee engaged in activity protected by the FLMA, 29 U.S.C. § 2615(a)(2).  Pereda, 666 F.3d at 1272 (citing Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001)).

**B.  Sheriff's Grounds for Summary Judgment**

The Sheriff argues that he is entitled to summary judgment on the FMLA claims because: (1) Burrows did not qualify for, i.e., was not entitled to FMLA benefits; (2) Burrows did not provide adequate notice to the CCSO; and (3) Burrows was terminated from employment for a legitimate reason unrelated to his request for FMLA leave.  (Doc. #20, pp. 11-18.)  The Court discusses each in turn.

**(1)  Whether Burrows Was Entitled to FMLA Leave**

The FMLA authorizes leave "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). It is undisputed that Burrows is eligible in terms of having worked the requisite hours, but the Sheriff argues he is

not entitled to FMLA leave because he did not experience a triggering event. Both types of FMLA claims require the employee to be entitled to the benefit denied. <u>Pereda</u>, 666 F.3d at 1272; <u>Hurley v. Kent of Naples, Inc.</u>, 746 F.3d at 1166–67; <u>White v. Beltram Edge Tool Supply, Inc.</u>, 789 F.3d 1188, 1191 (11th Cir. 2015). To be entitled to an FMLA benefit, an eligible employee "must demonstrate that []he sought leave for a qualifying reason and that []he provided notice meeting certain criteria." <u>Ramji v. Hosp. Housekeeping Sys., LLC</u>, 992 F.3d 1233, 1242 (11th Cir. 2021) (citing <u>White</u>, 789 F.3d at 1194-96).

The Sheriff argues that to show entitlement Burrows must demonstrate that his decision to leave the CCSO and go home to his wife was for a FMLA-qualifying reason. (Doc. #20, pp. 10-13.) More specifically, the Sheriff argues that "Burrows must demonstrate that his wife was suffering from a serious health condition on October 9, 2024, and that he needed to leave work to care for her." (<u>Id.</u> at 11.) The Sheriff does not dispute that Burrows' wife "suffers from various health conditions," (<u>id.</u>) but argues these conditions were not material to the events of October 9, 2024 (<u>id.</u> at 11-12). More specifically, the Sheriff argues that Mrs. Burrows' nervousness and feeling like she was going to have a heart attack do not qualify as a serious health condition (<u>id.</u>), and Burrows never notified the CCSO that his wife suffered from heart-related conditions or incapacitating chest pains/panic

attacks (id. at 15).  Therefore, the Sheriff argues, Burrows was not entitled to FMLA leave.

In this case, to be eligible for FMLA leave means showing that Burrows' wife suffered from a 'serious health condition.' Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048, 1052 (11th Cir. 2020) (citations omitted).  A "serious health condition" "means an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11). Additionally, continuing treatment for a chronic condition is considered a serious health condition if it requires periodic visits at least twice a year, continuing over an extended period of time, and may "cause episodic rather than a continuing period of incapacity."  29 C.F.R. § 825.115(c).

The Sheriff's view of the evidence is much too myopic.  When viewed in the light most favorable to Burrows, as the Court is required to do, the evidence is sufficient to allow a jury to find that Mrs. Burrows suffered from a serious health condition without actually having a heart attack.  Mrs. Burrows's health conditions had not substantially changed for years, and the CCSO continually found them to constitute a serious health condition by repeatedly approving intermittent FMLA leave.  Mrs. Burrows was routinely seen by a physician and clearly had chronic conditions which were

subject to flare-ups.  While a jury may accept the Sheriff's view of the evidence, it could also accept plaintiff's evidence that this did indeed constitute a serious health condition.

**(2) Whether Burrows Provided Sufficient Notice**

The Sheriff next argues that even if Burrows was entitled to benefits under the FMLA, he failed to provide sufficient notice to the Sheriff's Office.  The Sheriff argues that while the notice requirements differ depending on whether the need for leave was foreseeable or unforeseeable, Burrows never requested FMLA leave on October 9, 2024, at all.  (Doc. #20, pp. 13-16.)  The Sheriff asserts that the CCSO protocols required Burrows to provide verbal or written notice to Risk Management, and it is undisputed that Burrows did not do so despite having done so on multiple occasions in the past. The Sheriff argues that while Burrows notified two supervisors he was leaving, this was not a request for leave but a unilateral decision.  According to the Sheriff, this failure to comply with the CCSO notice requirements warrants denial of the FMLA claims.  (Id.)

The FMLA requires that the employee "actually seek leave-of some sort-to trigger an employer's obligation[s]" to give notice. Graves v. Brandstar, Inc., 67 F.4th 1117, 1122 (11th Cir. 2023). While an employee who needs FMLA leave must give the employer adequate notice of the need, FMLA's notice requirements depend on whether an employee's need for leave is foreseeable or

unforeseeable.  White v. Beltram Edge Tool Supply, Inc., 789 F.3d
at 1195. If an employee's need for FMLA leave is foreseeable, the
employee must give the employer at least 30 days' advance notice,
or "such notice as is practicable." Id. (quoting 29 U.S.C. §
2612(e)(2)). But if an employee's need for leave is not
foreseeable, the employee simply needs to "provide sufficient
information for [his] employer to reasonably determine whether the
FMLA may apply to the leave request." Id. at 1196 (quoting 29
C.F.R. § 825.303(b)). See also Munoz v. Selig Enterprises, Inc.,
981 F.3d 1265, 1276 (11th Cir. 2020).

    The content of the request for leave is also flexible.  The
employee's request for leave may, but need not, expressly refer to
the FMLA.  An employer's FMLA obligations are triggered "[w]hen an
employee requests FMLA leave, or when the employer acquires
knowledge that an employee's leave may be for an FMLA-qualifying
reason…." 29 C.F.R. § 825.300(b)(1).  "Once an employee gives
sufficient notice to her employer that potentially FMLA-qualifying
leave is needed, the employer must then ascertain whether the
employee's absence actually qualifies for FMLA protection." Cruz
v. Publix Super Markets, Inc., 428 F.3d 1379, 1383 (11th Cir. 2005)
(citation omitted). See also Ramji v. Hosp. Housekeeping Sys.,
LLC, 992 F.3d 1233, 1243 (11th Cir. 2021) ("[N]otice must simply
allow the employer to understand that the employee potentially
qualifies for FMLA rights.").

Whether the need for leave is foreseeable or unforeseeable, "[w]hen an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave. 29 C.F.R. § 825.302(c), § 825.303(b). When unforeseeable, "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act. The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b).

The critical question a Court asks is whether the "employee adequately conveyed to the employer sufficient information to put the employer on notice that her absence was potentially FMLA-qualifying." Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997). An employee must provide proper notice to make out an FMLA interference claim. White, 789 F.3d at 1195 (citing Hurley, 746 F.3d at 1167).

Mrs. Burrows had an established record of ongoing serious medical conditions for anxiety, blood pressure, and chronic pain. (Doc. #22, pp. 26-36.) Burrows sent correspondence in advance of the storm requesting consideration in light of his wife's anxiety and other medical history. Burrows specifically referenced past allowances that were made and FMLA leave that was approved.

Burrows points to the following chronology:

> **October 6:** Burrows emails requesting special consideration during Milton, explaining Lori's conditions. (Ex. 12 - Email Correspondence re Hurricane Milton).

> **October 8:** Burrows emails Sheriff Prummell detailing Lori's conditions (depression, anxiety, chronic pain, surgeries, needs hip replacement, no family in Florida, can't go to shelter). (Ex. 12 - Email Correspondence re Hurricane Milton). Sheriff responds: essential status means you must work, look for other positions if you can't meet requirements. (Ex. 12 - Email Correspondence re Hurricane Milton).

> **October 9:** Lori experiences severe chest pains/panic attack. Burrows informs Rodgers and Ramirez of emergency and leaves. (Ex. 4 - Burrows Deposition, 94:24-96:24).

> **October 11:** Notice of Intent to Withdraw Appointment issued. (Ex. 11 - Notice of Intent to Withdraw Appointment).

> **October 15:** Pre-disciplinary hearing. (Ex. 8 - Pre-Disciplinary Hearing).

> **October 16:** Termination effective. (Ex. 10 - Withdrawal of Appointment).

(Doc. #27, p. 18.) There are sufficient facts to go to a jury as to whether Burrows qualified for FMLA leave, and whether Burrows provided adequate notice that it was for a qualifying serious medical condition.

### (3) Whether Burrows' Employment Terminated for Other Legitimate Reasons

The Sheriff is entitled to raise his alleged lawful reasons for termination as an affirmative defense to FMLA liability. If an employer demonstrates that it would have discharged an employee

"'for a reason wholly unrelated to the FMLA leave, the employer is not liable' under the FMLA for damages for failure to reinstate." Spakes v. Broward Cnty. Sheriff's Office, 631 F.3d 1307, 1310 (11th Cir. 2011) (citations omitted).  In other words, the employer can show he would have terminated the employee anyway.  Lapham v. Walgreen Co., 88 F.4th 879, 896 (11th Cir. 2023) (citation omitted).

The Sheriff argues that even if Burrows qualified for FMLA leave and provided proper notice, he would still have been fired instead of being reinstated to his previous position because he abandoned his job and was unable to meet the expectations of an essential employee.  The Sheriff further argues that Burrows abandoned his job as an essential worker without authorization and did not immediately return after confirming that his wife was not having a cardiac episode.  (Doc. #20, pp. 16-18.)  Defendant argue, even if Burrows abandoned his job for a qualifying reason, it had no obligation to reinstated Burrows because of his admitted inability to remain an essential employee and the unavailability of another position.

Burrows responds that the Sheriff's burden cannot be met because: (1) CCSO gave prior approvals for absences during hurricanes, contradicting the claim of abandonment; (2) multiple contracted individuals who failed to report during Hurricane Milton had their badges revoked, but Burrow was terminated; and

(3) a temporal proximity between the leave request and the termination demonstrate causation. (Doc. 27, pp. 12-14.) Having determined that there is a genuine issue of material fact as to the interference and retaliation claims, the Court finds there are also material factual disputes as to whether Burrows would have been terminated anyway. For example, while the Sheriff argues Burrows did not notify Risk Management before leaving, he does not identify any part of the summary judgment record establishing that Risk Management was present at the CCSO during the hurricane and therefore available to be notified.

Accordingly, it is now

**ORDERED:**

Defendant's Dispositive Motion for Summary Judgment (Doc. #20) is **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this __26th__ day of January 2026.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Parties of record